Okay, we'll hear counsel in Sgro v. Bloomberg, and Mr. Brickman, Mr. Goldberg. Neal Brickman May it please the court, my name is Neal Brickman and I represent the plaintiff's appellants, Vincent Sgro, Albert Brassano, Vera Steck, and Anne Walker. I respectfully request that I reserve five minutes of my time for rebuttal. Anne Walker Sure, that's granted. Neal Brickman Your Honors, we had received an instruction to limit the argument today to Mr. Sgro's retaliation claim. Anne Walker Yeah, if you really feel strongly that, I mean, we recognize that you represent the others, but it seems, let me talk to that. A lot of the claims seem to be out, because we do read these things, on the statute of limitations, a number of the claims based on discrete actions. And it seems that Mr. Sgro's retaliation action doesn't suffer from that defect. Now, maybe Mr. Brassano's also withstands it. And so, we ask you to do that, because we thought that that seemed to be a potentially viable claim. If you feel strongly that the others are potentially viable, you can use your time any way you want. We don't really preclude you, but we'd like you to focus on that. Is that fair? Neal Brickman Yeah, I understand, Your Honor. And what I would suggest is, if in fact there is time left in my argument, and the court is inclined to ask questions regarding the remaining claims, we would be not only happy, but overjoyed to entertain those questions. Because there are two overriding themes, if the court please, with respect to both Mr. Sgro's retaliation claim, and the other claims in the continuing violation doctrine, and some other issues that were addressed by the court below. Those two first, that there is a thesis, which we believe is supported amply by the evidence, certainly sufficient to withstand a summary judgment motion, that Bloomberg has a policy that it enforces in varying, in a variety of different and increasingly invidious, we would say, ways to manage out its older employees. And by manage out, we mean put them in a position of increasingly demeaning responsibilities, or no responsibilities, such that it induces them to resign. Judy Woodruff What is PROS? What do they do in that division? Neal Brickman It is entirely, as I understand it, and as the record indicates, a data entry group. Judy Woodruff And that's where they put just the one in front of all the telephone numbers? Neal Brickman That is one of the many incredibly important tasks that they assign to Mr. Sprow. Judy Woodruff So is your case a retaliatory transfer case or a retaliatory termination case? Neal Brickman Both, Your Honor. The complaint, as it is written, talks about retaliation taken in response to complaints. There are actually three sets of complaints in this action. Some of them are implicated, as Your Honor pointed out, by the two-year statute of limitations. But we had complaints in 2001 of discrimination. We had complaints in mid-2002 of discrimination. And then we had complaints in 2004 of discrimination. Judy Woodruff We have to focus on the 04 complaints, right? Neal Brickman With respect, giving deference to the statute of limitations issue, the 2004 complaints preceded the transfer of Mr. Sprow, because we'll talk about him specifically now, to this prose group. Mr. Sprow is admittedly, there's no dispute about this, not a data entry person. He is not particularly computer literate. It is not his skill set. It is not why he was hired by Bloomberg, nor is it related at all  to Bloomberg. Judy Woodruff He was hired by Bloomberg because he came along with the magazine. Neal Brickman Correct. That was in the early 90s. But as the job morphed over time, that became a portion of the news division. Then there was a lifestyles group that wrote on things like coin collecting, stamp collecting, leisure time activities, which were picked up as part of the news stories. Judy Woodruff But we really can't get into Bloomberg's, the merits of whether Bloomberg should have gotten rid of lifestyles, et cetera. That's a business decision, and we can't do that. He seems to have done relatively well with his business decisions. Neal Brickman of Mr. Sprow's retaliation plan. What we have here is Mr. Sprow complained about discrimination. There's no dispute about that. There's no dispute that it's a protected activity. He did so in July. I'm sorry. I want to make sure the dates are correct. He did that in May and June of 2004. Judy Woodruff This is after he came back from his medical leave? Neal Brickman Correct. There's a subsequent medical leave, which I'll get to in a second, Your Honor. There's no dispute in the record. I guess I should go back. I had told you there were two contexts to consider this. The second context the court really needs to consider is that this was a summary judgment motion. This was not an issue determination. This was not a decision after trial. This was to identify issues to determine if there was a genuine issue for a trier fact to consider. It's very important to keep that in context when we get into the last prong of the retaliation requirement, which is when the burden shifts to the defendants to provide a legitimate, nondiscriminatory justification for the adverse employment action, whether we have presented ample evidence that that is, in fact, a pretext. Judy Woodruff Where did you plead wrongful termination? Neal Brickman We did not plead wrongful termination as such. We pled a retaliation charge in the complaint. During discovery, the question was raised, what were the adverse employment actions that we're pointing to in terms of the retaliation? And there was enormous discovery done with respect to not only the transfer to pros, and I'm referring to Mr. Scrow particularly, not only the transfer to pros as being an adverse employment action, but his termination. The district court understood that and in her decision considered as an adverse employment action in connection with the look at the complaint, such a generic retaliation claim that there were adverse employment actions taken in retaliation for protected activities. I submit, Your Honor, that the argument to which you allude is a straw man by the defendants. Judy Woodruff Because the issue was fully joined. Neal Brickman It was fully joined. It was fully discovered. It was part of the district court's decision below. It was fully briefed to the district court below. There was no surprise. There was no something that was considered at the court below and appealed from. Judy Woodruff Let's turn to causation for a minute. How do you survive summary judgment on causation when it seemed to me the record indicated that Mr. Scrow was cautioned on more than one occasion that he had to work a full-time schedule along with everyone else, and although he had historically done three days a week, he had to move to full-time  Well, Your Honor, I think that is the crux of the issue before this court, and you have to take a brief step back and consider under what circumstance, what's our burden to show that that legitimate nondiscriminatory justification that's been proffered is pretext. And I refer the court to the Fuentes case, which you decided in 1994, which Well, what's so implausible or incoherent or inconsistent about the notion that they ordered him to work a full-time schedule, he refused, and then they fired him. Well, you have to look at the totality of the circumstances. And where it starts is he was transferred to Global Data in November of 2001. All right. Well, now I'm trying to segregate the two because I'm trying to home in on whether our focal point should be the transfer or the termination. Well, I haven't challenged you on causation vis-a-vis the transfer, and that's not what I'm speaking to. I'm speaking specifically to what we submit as the pretextual justification for the termination, which is, as Your Honor points out, the warn several times that if he didn't work full-time. And looking at that in the totality of the circumstances, remember, he was transferred to Global Data, and the justification given was that you have to work full-time because everyone in Global Data works full-time. He was transferred to Global Data in November of 2001. This announcement that he had to work full-time, that everyone in Global Data worked full-time, nothing in 2001, nothing in 2002, nothing in 2003. He was transferred specifically to the PROS Unit within Global Data in July of 2004, nothing in 2004. The first mention of it is late January of 2005. Suddenly, when these other attempts we would submit to manage Mr. Sproul out of his position have failed, they said, we have to come up with something else. We've got to get rid of this guy. He's too old. And what did they come up with? Something that they hadn't considered in the exact same circumstance in the previous four years. Suddenly, he has to work full-time. So there's a series of emails. Excuse me. I'm sorry. When did they first have this policy that everyone has to work full-time? I think that might... Presumably, and what the record indicates, Your Honor, is the policy as relayed to Mr. Sproul in 2005, which isn't written anywhere, was that everyone in Global Data works full-time. It wasn't that we changed the policy. It was that everyone in Global Data always worked full-time. And the problem with that is, he'd been in Global Data since November of 2001. Working part-time. For working part-time pursuant to an agreement. So going back to the Fuente standard, why is it implausible? Because it is made of whole cloth. It comes out of the blue. I guess what I'm sort of struggling with is, it was completely within his control, whether he was terminated. All he had to do was work full-time, like everyone else in the group. And I understand your position that there was a Johnny-come-lately decision to make everyone in the pros group work full-time. But nonetheless, I didn't see any record evidence to suggest that there were certain favorites who were exempted from that full-time requirement. If they all had to work full-time, he has a decision to make. Either I work full-time and I remain employed by this outfit, or I leave. Well, there's another element to it, if Your Honor please. And it's something the defendants are quite silent on, and understandably. If you look at the emails and the record, the exchange in January and February of 2005 about working full-time, they insist that Mr. Scrowe not only work full-time, not only increase the number of hours per day he works, because he's coming in at 10 and leaving at 4.30, they're saying you have to report to work at 8 and leave at 5. And they're saying, in response to direct inquiries from Mr. Scrowe, we're not going to pay you an additional cent for working the extra hours per day, and the extra day per week. And Mr. Scrowe asks, and quite frankly, the emails appear in the appendix at about 5.32 and forward. He says, why should I have to, given that I have an agreement and there's no business need for me to come put a one in front of an area code full-time, you're asking me to work substantial additional hours in an area not anywhere related to my expertise or experience at no extra compensation. So you're basically asking me to work this extra time for free. And if you understand that the thesis, the starting point for the analysis in a summary judgment motion, you've got to understand, does that create an issue of fact as to whether or not the profit reason is a pretext? Mr. Brickman, may I understand this? The district court said, as it initiated the paragraph about retaliation, plaintiffs contend that because of the initiation of the instant suit, Bloomberg retaliated against Scrowe by terminating him. Does that mean that on the summary judgment motion, the only protected activity that was relied upon was the suit? Not exactly, Your Honor. With respect to the termination, the district court focused solely on the commencement of the suit. Just in terms, temporarily, the suit was commenced on February 7th of 2005. Mr. Scrowe went out on disability and returned March 1st from that disability, and he was terminated on effective March 21st of 2005. But there is another aspect of the retaliation, and that is with complaints made in May and June of 2004 of discrimination, Mr. Scrowe was transferred in July of 2004 to the pros unit where he was... But was that scenario argued to the district court? Yes, Your Honor, it was. And it is considered in the district court's decision. And we would find that in whatever brief you filed on... Not only in the brief, but it's actually addressed in the district court's decision. I could look for it for you, but it is in there under the retaliation... Thank you. Your red light is on. I'm sorry, Your Honor. You will have rebuttal after we hear from... Thank you very much. It was a joy being here. Thank you. It's not over. We don't usually make it that joyful. Yeah, it may get worse. Good morning, Your Honors. May it please the court, my name is Thomas Golden from Wilkie, Farr, and Gallagher, and I represent the FLE Bloomberg LP. Mr. Brickman referred to a thesis, which is that Bloomberg had a practice of forcing out older workers. And the problem that infects his case and his opposition to the summary judgment motion is there are no facts to support that thesis. Give us the temporal, the time. I don't think I have all these things in my head. Certainly, Your Honor. So give us the first act, the alleged retaliation, the second act. Well, Your Honor... All within the space of from mid-2004 to mid-2005. I'm happy to, Your Honor. Yeah, let's get that. And Mr. Brickman, I guess we'll start with... Now, what do you start with? Well, what's on the record? Okay, fair enough. The record is that in May, I'm sorry, I think the record probably starts for these purposes in 2001, when by all accounts, the appellants are transferred into the data division at Bloomberg. And from that point forward, the appellants contend that the work they were asked to do was beneath them, demeaning. They say that, for instance, they were forced to... Okay, let's do the time. Okay. Please, I don't mean to interrupt, but we'll never get to the time. The fall of 2001, they're transferred into data. Okay. In May and June of 2004, Mr. Bassano, but not Mr. Segreau, complains internally of unfair treatment and age discrimination, and he complains to the chairman of the company. In July of 2004, Mr. Segreau and Mr. Bassano are transferred from one group in data to another. They had been in the web indexing part of data, which was taking data off of the internet and putting it into the Bloomberg system, and they're now transferred into a different part of Bloomberg's data. The putting the one, the important job of putting the one in front of the telephone. Mr. Segreau says that's what he was asked to do. His supervisor, Ray Whitman, testified, and this has not been contradicted, that that was an example of all sorts of things that people in Mr. Whitman, he himself testified. Okay. Everyone did this work, including himself. In July of 2004, as there was a meeting with human resources and Mr. Segreau to discuss his new role in the PRAS group in data, at that point, Mr. Segreau is told, you're going to have to work a full time schedule like everyone else. July of 2004, seven months before he filed his lawsuit. After he was transferred. In connection with the transfer. I think it was in the context of discussing the transfer. Okay. So it was simultaneous with the transfer. Mr. Segreau at that meeting says, I absolutely will not work a full time schedule in this job. He then goes out on medical leave for stress related issues. He then, in late January of 05, is getting ready to return to work. And Bloomberg at that time, in connection with getting ready for his return to work, says, Mr. Segreau, as we discussed back in July of 2004, Bloomberg expects you to work a full time schedule like everyone else. And he said, I will not do it. And that continued for a period of time. And it's in the appendix, the emails during this time period, back and forth. Bloomberg HR saying, Mr. Segreau, really? You have to work a full time schedule like everyone else. And he says, I will not do it. And Bloomberg is warning him. But if you persist, you face termination. Okay. Now, at the time, when did Mr. Segreau, well, certainly Mr. Bassano, when did Mr. Segreau first complain about the transfer on the basis of, was his complaint age related? I think it's fair to, well, sometime after July 2004, after he was transferred into the pros group. Okay. Now, why shouldn't a jury, or should a jury, let me put it that way, have the right to decide that the pressure to work full time was related or in response or retaliatory in the legal term from the complaint about age related actions? Isn't that what we really are here to decide? I think that is the issue, Your Honor. And respectfully, we think not. Why? Well, the claim, while it's under New Jersey state law, is subject to the familiar McDonnell Douglas burden shifting. But New Jersey state law uses the federal. Exactly. That was my point, Your Honor. Clearly, Bloomberg has articulated, let's say that Mr. Segreau has made a prima facie case of retaliation because he's pled protected conduct, adverse action, and a temporal proximity that will say, for purposes of this argument, satisfy the causation problem. The burden then shifts to Bloomberg to produce, not to convince, but to produce evidence that, if believed, would constitute a legitimate business reason. It has clearly done so. It has said, first, with respect to the transfer into pros, that it was based on management's decision that there was a need for more resources in pros. And we put that in our Rule 56.1 statement. And the appellants stated, this is at page 601 of the appendix, they are unable to refute, admit, or deny that. Well, Mr. Brickman says that's a fine reason. Maybe it'll convince a dryer of fact. But the record shows that they, even if they had this full-time policy, and I'm not sure where it shows that they had the full-time policy, they enforced it against me only after I complained. I mean, I think that's his position. Now, so one, where can we see, is there a record, is there a document showing they had the full-time policy in the record? And how do you answer, why shouldn't a dryer of fact have an opportunity to see who's right on this? Well, Your Honor, we've taken that in the order in which Your Honor presented it. First, in terms of the full-time policy, I think it is established and beyond dispute. Again, there's deposition testimony that everyone in data had to work full-time. Again, in our- But they didn't enforce it as to him. Not as to him. He's been there since 01. Your Honor, there is, correct. And Mr. Segrost testified that up until the end of, I believe, 2003, he had a son with a very, very serious illness who unfortunately passed away. And I think the record reflects, not that Mr., not that the policy was, well, I think the record reflects that Mr. Segrost made his own hours and no one challenged him on it. And that's fair. Okay, but the jury can, a founder of fact, can take that into account, that whatever his reasons, there were no emails, let's say, pressing him to work full-time until, from what you say, until they, let's say, called it to his attention forcefully that he had to work full-time. Isn't that what we have here? I mean, you're telling us, well, they did have the policy, but they didn't enforce it as to him. Correct, Your Honor. But again, in July 2004, which is when the record makes clear the issue was raised with respect to Mr. Segrost, it was in the context of his moving into a new position with a new manager where there was significant needs, and his manager testified, and it's in the record, that Mr. Segrost's refusal to work full-time was causing both productivity and morale problems, as everyone else in the group is saying, why is this individual allowed to sort of come and go as he pleases, or what seems to be as he pleases? I mean, I've asked too many questions. Maybe one of my colleagues. I'm sorry. But Your Honor, I think what I would say is, under the McDonnell-Douglas burden shifting, we have clearly produced the evidence of a legitimate non-discriminatory reason. And he says pretext. But he doesn't produce any evidence to substantiate that. Well, is that right? If we see Mr. Segrost's long experience as a part-time person, and then the shift to insistence by the company as suddenly it becomes vital, it becomes full-time, then would not a fact finder be authorized to look at that tension? And then the ultimate termination of saying, well, maybe they had a good, maybe they had a policy, but why did they suddenly enforce it in this draconian way against the plaintiff? Isn't there an issue there that should be looked at or can be looked at by a fact finder? I think the problem with that is it breaks down when you look at the evidence in the record. Because again, the premise for that aspect of the retaliation theory, that is, that when Bloomberg raised the issue in July 2004, it was in retaliation for complaints, is there were no complaints by Mr. Segrost leading up to that. The complaints to which Mr. Brickman refers in his briefs and his argument were by Mr. Bassano, not Mr. Segrost, and were not made to the individuals who told Mr. Segrost, you're working for us now, and we expect you to work a full-time schedule like everyone else. And so I think on that aspect of the theory, that is, that the initial insistence on adherence to the part-time policy fails because there is no protected speech that caused it. Clearly, if you got to the termination point, there was protected activity in the sense of the filing. What was the first item of protected activity in your view? Well, clearly in the 2001-2002 time frame. No, within the statute. I think it was, according to the record, it was only after Mr. Segrost was transferred into the pros group and after he was told to work a full-time schedule that he began complaining that this work is beneath me. There is no evidence that he said, I think I've been discriminated against because of my age during this time period. Rather, there is evidence in the record that he repeatedly said to his manager, this work is beneath me. Is that not protected? Let's say you have, I'm sorry, did I cut off your series of questions? I don't know, I was interested. No, no, no. If I had a series, I should have had them cut off, but I didn't have a series. Is it not, I mean, is it not an adverse employment action to take someone, an employee who had been doing work at a relatively high level substantively and looking into the web and taking relevant things out of it is high level? That's what my daughter does, so I know that's high level in the health field. And then being transferred to a relatively menial kind of job. Is that not an adverse action, potential adverse action also, or do you have to be fired to be adverse? Certainly you don't have to be fired, Your Honor, but I don't think it was an adverse action because I don't think that the record suggests that the work he was doing in the web indexing group was meaningfully different than what he was doing in the pros group, unlike what... Is that something we can decide or is that something a prior effect? I think Your Honor, Your Honors, I think can decide it because the record makes clear that starting in 2001 when Mr. Segrost was moved into this group, he and others and his co-parties complained repeatedly that the work was beneath them. No, that's right. That's my point. So even in that web indexing group. There were, yeah, but there were complaints and I'm just trying to figure out if the complaints about the work being beneath him. After all, he had a magazine that they thought was important enough to buy. Well, Your Honor, he had in the early 90s a publication that published the prices at which petroleum traded. I think it's... Whatever it was, Bloomberg thought that it was worth buying that and him with it. Well, Mr. Segrost also testified that from day one when Bloomberg bought the publication and gave him an employment contract, he had nothing to do. His testimony is from day one, I had nothing to do and I sort of had to find something for myself to do. All right, but he was a man who had some skills in something, obviously. I mean, I think, I don't want to decide this. The question, all I have to decide is, well, we have to decide is whether there's enough there for a prior effect. I understand, Your Honor. To decide it. And so, well, maybe somebody else has a question. I interrupted you. Go ahead with your questions. Respectfully, Your Honor, I think under the law, an employee cannot survive summary judgment by saying it might have been something else. They have to point to evidence, which if believed, would establish a pretext and I think they have failed to do so here. And I think this case... I'm sorry, I see my time is up. No, that's all right. You're on our time now. Did you have some questions? No, I have none. I had hoped you did. Okay, do you have anything? Okay, I think we understand, but we will hear the rebuttal. Thank you, Your Honor. Thank you very much. If Your Honor's please, I'll be very quick. There are just three points and I guess it's a habit of rebuttals to announce only three points and then go on for as long as the court will allow us. But the first point, and this jumps from Mr. Golden's argument, he keeps on referring to the first complaint was 2001, the first complaint was 2002. I would invite the court to just revisit this notion of a continuing violation, not discrete acts, but a plan, a process by which this organization systematically managed out its older employees. And we would submit, and Mr. Golden sort of steps right in it, that if the 2001 complaints were the same as the 2002 complaints, were the same as the 2004 complaints, were the same as the 2005 lawsuit, there is at least a question which should be presented to the trier of fact as to whether this constitutes not discrete acts, but a continuing violation. And I would simply invite the court- Mr. Brickman. Oh, go ahead. Did I just step into it? What did Segros say in 2004 that should be understood as being a complaint about kicking out old people? Protected activity. There are two occasions in 2000, I'm sorry, three occasions in 2004 the deposition testimony of Mr. Skro, which is specifically cited in our reply brief, says in May and June, Mr. Bassano sent emails and there were subsequent conversation. Mr. Bassano's emails were on behalf of both Mr. Skro, it was on behalf of all the old Lifestyles group that don't fit groups, saying we are being discriminated against because of our age. How are we being discriminated against? And it talks about the nomadic life they were forced to lead, moving from one office to another, not being given tasks, not being allowed to do certain things, and then being given the menial task of entering the one. So that was the first two times, May and June. Bassano said he was speaking for Segros. His email made clear that this was a complaint on behalf of the Lifestyles group, including Mr. Skro. That was followed up by oral conversations in May and June, and then the one conversation that Mr. Golden acknowledges happens when he is transferred to the Pros group in July of 2004. He again complains that he is being discriminated against because on the basis of his age, and he is being... When you say May and June, they were oral conversations. Correct. Who participated? That was... Bassano or Segros? Both, and they were with Gail Gross, and they were testified to in the depositions, and not refuted by either Ms. Gross or by any other witness. And did they talk about age? Yes. So we'll find that in the record. Yes, you will, Your Honor, and there are specific references to it in the reply brief. In fact, what is somewhat of an anomaly and makes your job more difficult than it should be is the emails that Bassano sent are not part of the record. Their content is addressed... Maybe that makes it easier for us. Well, no, their content is addressed in deposition testimony, and that deposition testimony is not controverted or questioned. Can I ask why they're not part of the record? I don't have a good answer for you, Your Honor. I mean, do you have those emails? Yes, both the defendants and the plaintiffs have those emails. Oh, Lord. And I suppose the best answer I could give the court as to why they're not included is that it wasn't a matter at issue. The only issue with respect to the retaliation claim was not protected activity, not adverse employment action, but whether the proffered alleged non-discriminatory justification was a pretext or not. That was the only issue that we thought, until I heard Mr. Golden speak today, was at all at issue. Now, but you say that there is deposition testimony that is in the record that refers to the email. Correct, Your Honor. And that if it were to go back, if it were to go back, then the emails would be produced to the triars at bat. I would assume that's a correct answer. The second point, and it's subsumed in a lot of the questions the court has asked, is we take great issue with the timeline that Mr. Golden has. What's your timeline? My timeline, very specifically. Be very specific. And we'll start in 04 because I know that our time is limited. May. Okay. Gives us five years. May and June of 2004, there are complaints by Bassano and Scrow, we submit, about adverse employment actions and age discrimination. And were they written complaints or were they oral complaints? Both, Your Honor. Okay. He is then, Mr. Scrow is then transferred, we say, retaliatorily, retaliatorily to the pros group in July of 2004. Mr. Golden then talks to the court and says, at his orientation meeting in July of 2004, this notion of working full-time comes up. There is nothing in the record to support that. There is no writing. There is no insertion into his personnel file. There is no instruction. And we submit that the first time there was any discussion of full-time was in the January-February time frame. And it's very, very- 2005. 2005. And if the panel pleases, the record at 5.30 is a very instructive email, which is a February 1, 2005 email. Mr. Scrow writing, Hi, Brenda. Further to our conversation of the other day, I have never agreed to increase my hours. My schedule with Bloomberg is 10 to 4.30, four days a week. And it has been that way for years as per prior agreements. You said you had to advise others about this, insinuating that this is the first time she had to talk to her people about it and get back to me since you thought otherwise. I am shocked you would bring this up as a new development as this has been my position from day one, especially with no increase in compensation. Thanks, Vince. That email is the precursor to the email cited in the district court's opinion that they threaten him if he doesn't begin working full-time  with no additional compensation with discipline up to and including termination. The third point, Your Honor, and this piggy banks on certain questions Your Honor asked, is this is a summary judgment motion. These questions the court has asked and these answers we've given in terms of why the evidence shows the sudden enforcement of a non-written policy that doesn't appear anywhere is protectual as a reason to get rid of this fellow are questions that a jury should consider. They should weigh the credibility of the witnesses. They should weigh the totality of the circumstances and let Mr. Scrow have his day in court. Thank you very much. Thank you. But don't leave the courtroom, please. Would you and Ms. Fong come up, please? Turn off the mic, please, Mike. Why are you talking about the dollars? You're taking just Mr. Scrow. I mean, how much? Is everyone Clark here? Yes. Nice to meet you, man. Yeah.